# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| AUSTIN SIEGERT, on behalf of himself and all others similarly situated,<br><br>          Plaintiff,<br><br>v.<br><br>SWEDISH MATCH NORTH AMERICA, LLC, 1021 East Cary Street, Suite 1600, Richmond, VA 23219; and PHILIP MORRIS INTERNATIONAL INC., 677 Washington Blvd., Suite 1100, Stamford, CT 06901,<br><br>          Defendants. | Case No. ___25-cv-1606_____<br><br>**CLASS ACTION COMPLAINT**<br><br><u>DEMAND FOR JURY TRIAL</u><br><br><br><br>September 26, 2025 |

## SUMMARY

This case seeks relief for consumers who have been misled about the nature and safety of ZYN nicotine pouches. Hooking young people on nicotine creates a lifetime of revenue for the tobacco industry. As traditional tobacco products like combustible cigarettes have gone out of style, many tobacco companies have reinvented themselves and created a marketplace sensation with nicotine "pouches." Defendants in this case market their nicotine pouches as "tobacco-free" to consumers, misleading consumers about the fact that the pouches actually contain nicotine derived from tobacco. Additionally, ZYN nicotine pouches display "3mg" and "6mg" nicotine labels, which mislead consumers into thinking the addictive nature of these products is far lower than it is. Defendants also market the pouches to young people, misleading

them about the illegality, in all fifty states, of selling these nicotine pouches to people younger than 21 years of age.

This lawsuit seeks to hold Defendants accountable for their false and misleading advertising.

## **PREAMBLE**

Plaintiff Austin Siegert ("Plaintiff" or "Siegert") brings this action on behalf of himself and all others similarly situated who purchased ZYN nicotine pouches during the class period ("Class members"), as defined herein. Plaintiff Siegert alleges that Defendant Swedish Match North America, LLC ("Swedish Match") and Defendant Philip Morris International Inc. ("PMI") (collectively, "Defendants"), have marketed and advertised nicotine pouches, sold under the brand name ZYN ("the Products"), in a misleading and deceptive manner:

***First***, Defendants market and advertise the Products as "tobacco-free." This representation is false because the nicotine is derived from tobacco, not synthetically manufactured. Consumers have long been concerned about the health consequences of tobacco, and a "tobacco-free" promise misleads them into believing that these nicotine pouches do not have the safety risks associated with tobacco or tobacco-derived nicotine products, or that the Products are safer than it really is, when in reality the Products pose significant health concerns.

***Second***, Defendants label the Products as containing "3mg" or "6mg" of nicotine, without additional details or explanation, which misleads consumers to believe the nicotine content is low and/or to underestimate the nicotine content, strength, and addictive nature of the Products.

***Third***, Defendants aggressively market the Products to attract young buyers, misleading them to believe that it is legal for them to purchase the Products—when in fact it is illegal in all

states to sell the Products to consumers younger than 21 years of age. This marketing deceives not only young consumers but adult consumers as well, for whom the marketing to young persons (despite the illegality of those sales) provides a veneer of healthfulness and vitality to the Products.

Defendants' conduct violates business and consumer protection law and constitutes a breach of the implied warranty of merchantability. Plaintiff alleges the following based upon the investigation of his counsel and upon information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge.

## **INTRODUCTION**

1.      ZYN is a thin white pouch that contains white powdered nicotine. The nicotine contained in ZYN pouches is extracted from tobacco leaves, but the pouches do not themselves contain tobacco leaves.[1] Instead, they are "made up of a powdered form of nicotine salt derived from commercial tobacco leaves that is mixed with fillers."[2]

2.      The advertised use of a ZYN pouch is for a consumer to place the pouch under the upper lip for up to 60 minutes and then discard the pouch.[3] Released nicotine is absorbed via the oral mucosa.

3.      Other ingredients in ZYN, based on the ZYN website, are food-grade additives, fillers, a stabilizer (hydroxypropyl cellulose), pH adjusters (sodium carbonate and sodium bicarbonate), artificial sweeteners, and flavorings.[4]

---

[1] *ZYN & The Rise in Popularity of Nicotine Pouches*, Pub. Health L. Ctr., at 2 (Aug. 2024), https://www.publichealthlawcenter.org/sites/default/files/resources/Popularity-of-Nicotine-Pouches-FAQ.pdf.
[2] *Id.*
[3] *Still Have Questions?*, ZYN, https://us.zyn.com/questions/ (last visited Sept. 17, 2025). *(see* Using Zyn).
[4] *Still Have Questions*?, ZYN, https://us.zyn.com/questions/ (last visited Sept. 17, 2025) *(see* Zyn Basics: What's in the pouch?).

4.     Nicotine pouch sales in the United States are exploding. ZYN itself has seen its U.S. shipments grow from 1 million six years ago to 334 million as of 2024—amounting to a 119% annualized growth.[5] ZYN further experienced a 65.7% increase in quarterly U.S. sales from Q3 2022 to Q3 2023.[6] Lastly, ZYN has established itself as the dominant player in the U.S. nicotine pouch market, securing an impressive 76% share of the retail market in terms of dollar sales for Q3 2023.[7] "Few products globally can match this remarkable growth in such a short period of time."[8]

5.     Consumer interest and demand for ZYN pouches is skyrocketing in part because the Products' advertising misleads consumers to believe nicotine pouches are safer than they actually are. The Products are advertised as "tobacco-free," which is misleading because the nicotine is tobacco-derived and likely contains carcinogens and other toxins from the tobacco leaf. Whereas consumers associate health concerns with tobacco, using the "tobacco-free" designation also misleads consumers to believe that pouches are safer, when in reality the Products pose significant health concerns.

6.     Interest in ZYN has peaked because of ZYN's "3mg" and "6mg" nicotine labels, which mislead consumers to believe the addictive nature and nicotine strength of the Products are low and/or at least significantly less than other forms of nicotine delivery products.

7.     Additionally, sales are high because Defendants' advertisements for ZYN aggressively target young people, although it is illegal in all states to sell these Products to people

---

[5] Peter Westberg, *The Rise of ZYN: Redefining Nicotine Consumption*, Quartr (Feb. 2, 2024), https://quartr.com/insights/company-research/the-rise-of-zyn-redefining-nicotine-consumption.

[6] *Press Release: Phillip Morris Int'l Reports 2023 Third-Quarter*, Phillip Morris (Oct. 19, 2023), https://philipmorrisinternational.gcs-web.com/static-files/4951882b-58aa-4532-beeb-41831cef6860.

[7] Westberg, *supra* note 5.

[8] *Id.*

under twenty-one years of age. The advertising, therefore, is misleading about a material fact—that youth and young adults cannot purchase the Products legally.

8.    ZYN's popularity among youth arises from Defendants' sale of the Products in a multitude of flavors, *see infra* Section III.

9.    ZYN nicotine pouches are sold in ten different flavors: chill, cinnamon, citrus, coffee, cool mint, menthol, peppermint, smooth, spearmint, wintergreen.

10.    ZYN Products cannot lawfully be sold to young adults or adolescents. On December 20, 2019, Congress passed a "Tobacco 21" law to prohibit the sale of tobacco and non-tobacco nicotine, which includes ZYN Products, to people younger than 21 years of age.[9] Therefore, Defendants' aggressive marketing to young people is misleading about a material fact—that people younger than age 21 cannot legally purchase the Products, which are subject to enhanced regulation.

11.    Defendants engage in unfair and deceptive advertising by marketing their tobacco-derived Products as "tobacco-free," which is misleading as to their nature and safety; by representing that the Products contain "3mg" or "6mg" of nicotine, which is ambiguous and misleading as to their safety and addictive nature; and by targeting young people when it is illegal for people younger than 21 to purchase the Products.

12.    Defendants have violated business and consumer law, and their actions constitute a breach of an implied warrant of merchantability. Plaintiff seeks to hold Defendants accountable

---

[9] *Tobacco 21*, FDA, https://www.fda.gov/tobacco-products/retail-sales-tobacco-products/tobacco-21 (last visited Sept. 17, 2025).

for misleading representations that have caused economic injury and brings this class action on behalf of himself, and all others similarly situated, seeking equitable and monetary relief.

## JURISDICTION AND VENUE

13.    This Court has original subject-matter jurisdiction over this proposed class action pursuant to 28 U.S.C. § 1332(d)(2)(A), the Class Action Fairness Act. There are more than 100 members in the proposed class, at least one of whom is a citizen of a different state than Defendants. The amount in controversy exceeds the sum of $5,000,000, exclusive of interest and costs.

14.    This Court has personal jurisdiction over the parties in this case. Plaintiff Siegert, by filing this Complaint, consents to this Court's jurisdiction.

15.    This Court has personal jurisdiction over Defendant Swedish Match pursuant to Connecticut General Statute § 52-59b(a). Defendant Swedish Match has sufficient minimum contacts with Connecticut to establish personal jurisdiction of this Court over it because Swedish Match sells its Products within the state and directs its marketing at Connecticut consumers.

16.    This Court has personal jurisdiction over Defendant Philip Morris International, Inc because it is headquartered in Connecticut.

17.    Venue is proper in this District under 28 U.S.C. § 1391(a). Substantial acts in furtherance of the alleged improper conduct, including the dissemination of false and misleading marketing and advertising regarding the nature of the Products and sales of the Products at issue, occurred within this State.

## PARTIES

18.     Defendant Swedish Match North America, LLC is a Delaware limited-liability company with an address at 1021 East Cary Street, Suite 1600, Richmond, Virginia 23219.

19.     Defendant Philip Morris International, Inc. is an American multinational tobacco company that sells products in more than 180 countries and is incorporated in Virginia with headquarters at 677 Washington Boulevard, Suite 1100, Stamford, Connecticut 06901.

20.     Defendant Swedish Match is a subsidiary of Defendant PMI. Defendant PMI runs ZYN sales through Defendant Swedish Match in the United States.

21.     Defendants market, sell, and encourage the sale of ZYN nicotine pouches in retail stores in Connecticut and through resellers. Defendants also market ZYN nicotine pouches to consumers in Connecticut through social media and the ZYN website.[10] Defendants have been the top seller of nicotine pouches in the U.S for several years.[11]

22.     Plaintiff Siegert is a citizen of the State of New York and a resident of Westchester County. At all times mentioned herein, Plaintiff Siegert was and is an individual consumer older than the age of 21.

23.     Plaintiff Siegert purchased Defendants' ZYN Products in the following flavors: cool, wintergreen, spearmint, and peppermint.

24.     Plaintiff Siegert purchased Defendants' Products, as described in the foregoing paragraphs, between 2022 and 2025. Plaintiff purchased the Products daily.

---

[10] *See infra* Sections II and III; *see also* Zyn, https://us.zyn.com (last visited Sept. 22, 2025).

[11] Kristy L. Marynak, et al., *Nicotine Pouch Unit Sales in the US, 2016-2020*, 326(6) Jama566–568 (Aug. 10, 2021), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8356066/; Yanun He, et al., *Trends of oral nicotine pouch prices and sales by product characteristics in the USA, 2021-2024*, Tob Control, *Tobacco Control,* Published Online First (June 12, 2025), doi: 10.1136/tc-2024-059222.

CLASS ACTION COMPLAINT

25.    Plaintiff Siegert purchased Defendants' Products in Westchester County at the following location: Madaba Deli & Grocery, 582 Warburton Avenue, Hastings-on-Hudson, New York 10706. Plaintiff would also purchase the Products at various gas stations in New York, New Jersey, and Connecticut.

26.    Plaintiff Siegert, when he purchased the Products, saw and believed that the Products lacked the safety risks associated with tobacco and tobacco-derived nicotine products and that the Products were safer than they are based on the fact that they were advertised as "tobacco-free" and that they were advertised by young, healthy-looking fitness influencers on social media.

27.    Plaintiff Siegert is a user of Zyn nicotine pouches. Like so many people, he became hooked on such products without knowing the dangers that Zyn Products conceal. Because of Defendants' deceptive marketing, he became a consumer without fully comprehending that he was beginning an addictive habit. Plaintiff Siegert, while working hard to discontinue nicotine pouch use, remains a consumer and has a strong interest in having full disclosure regarding the Products. Plaintiff Siegert wishes to be able to make the best choices among nicotine pouches, in terms of health risks, accurate description of nicotine, tendency for increased addiction through the use of flavors, and price.

## **FACT ALLEGATIONS**

I.    **Defendants' "Tobacco-Free" Representations Are False and Mislead Consumers.**

28.    As depicted below, Defendants make representations that ZYN nicotine pouches are "tobacco-free."

CLASS ACTION COMPLAINT



12



13

29.    The packaging for the Products depicted below is commonly seen at retail stores in

Connecticut.[14]

---

[12] *Global Issues Nicotine Pouches*, Tobacco-Free Kids, https://www.tobaccofreekids.org/what-we-do/global/nicotine-pouches (last visited Sept. 17, 2025).

[13] *ZYN Peppermint 6mg Nicotine Pouches*, Food4Less, https://www.food4less.com/p/zyn-peppermint-6mg-nicotine-pouches/0060924990103 (last visited Sept. 17, 2025).

[14] Paul Schott, *Zyn nicotine pouch and the CT-based company that produces it at the center of a lot of controversy*, CT Insider (July 13, 2024), https://www.ctinsider.com/business/article/ct-zyn-nicotine-pouch-philip-morris-international-19531998.php.

CLASS ACTION COMPLAINT



30.    Upon information and belief, "Tobacco-free" is literally false because the nicotine in ZYN pouches is derived from tobacco.

31.    A product labeled "tobacco-free" is generally considered "non-tobacco derived,"[15] meaning that the nicotine is synthetically derived, *i.e.*, made in a laboratory,[16] which is not the case with the nicotine in the ZYN Products.

32.    This distinction is important because studies have shown that the process of extracting nicotine from a tobacco leaf, the process Defendants use for the Products, will extract toxins and carcinogens as well, which ultimately end up in the resultant product.[17] Smokeless tobacco products may not contain all the harmful substances present in combustible cigarettes, but substances of serious toxicological concern are present.

---

[15] Sam N. Cwalina, B.S. et al., *Tobacco-free Nicotine — New Name, Same Scheme?*, 385(26) N. Engl. J. Med.: 2406–2408 (Dec. 18, 2021), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9153389/.

[16] *Regulation and Enforcement of Non-Tobacco Nicotine (NTN) Products*, U.S. Food and Drug Admin., https://www.fda.gov/tobacco-products/products-ingredients-components/regulation-and-enforcement-non-tobacco-nicotine-ntn-products#What%20are%20NTN (last visited Sept. 17, 2025).

[17] Nadja Mallock et al., *Levels of Nicotine and Tobacco-Specific Nitrosamines in Oral Nicotine Pouches*, 33 Tobacco Control 193–199 (Aug. 5, 2022), https://tobaccocontrol.bmj.com/content/33/2/193.

33. For instance, a study found that ZYN pouches contained ammonia, chromium, formaldehyde, and nickel, which are harmful compounds traditionally found in tobacco.[18]

34. Another group of substances of serious toxicological concern are carcinogenic tobacco-specific nitrosamines (TSNA), with two carcinogens, NNN (N-Nitrosonornicotine) and NNK (4-(Methylnitrosamino)-1-(3-pyridyl)-1-butanone).[19] TSNAs are formed from alkaloids in the tobacco.[20]

35. A recent study[21] analyzed forty-six different nicotine pouch samples from 20 brands and found that "TSNAs were detected in more than half of the [nicotine pouch] samples" tested and that the "presence of carcinogenic TSNAs in the nicotine pouches is of serious concern."[22] The cancer-causing properties of NNN and NNK are of special relevance for nicotine pouches that are used in the oral cavity, as is the case with ZYN nicotine pouches, because NNN and NNK are specifically associated with esophageal tumors (those that form on the esophagus).

36. The researchers advocated that the occurrence of toxic substances should be routinely monitored in nicotine pouches.[23]

37. Upon information and belief and noting that ZYN provides no information about its Product testing, it is likely that batches of ZYN pouches contain TSNAs since the nicotine in ZYN pouches is extracted from tobacco leaf.

---

[18] Suzanne Back et al., *Harmful and Potentially Harmful Constituents (HPHCs) in Two Novel Nicotine Pouch Products in Comparison With Regular Smokeless Tobacco Products and Pharmaceutical Nicotine Replacement Therapy Products (NRTs)*, 17 BMC Chemistry 9 (2023), https://bmcchem.biomedcentral.com/articles/10.1186/s13065-023-00918-1.

[19] *Id.*

[20] *Id.*

[21] Mallock, *supra* note 17. This is a German study that tested 20 brands. ZYN is a leading brand in Germany and was most likely tested, though it is not specifically named in the study. Nonetheless, upon information and belief, ZYN's Products have the same identified health concerns.

[22] *Id.*

[23] *Id.*

38.     The "tobacco-free" representation is, therefore, misleading not just because the nicotine in the Products is, in fact, derived from tobacco, but also because it creates the perception that the health concerns of tobacco are absent from the Products and that the Products are, therefore, healthier.[24]

39.     People believe they are buying a product that is safer than a tobacco-derived product, which is false. People believe they are receiving a product not derived from tobacco, which they are not. The nicotine in ZYN is not synthetic as the label connotes, but rather, is extracted from tobacco and contains harmful compounds found in tobacco.

40.     This mistaken belief significantly impacts consumers, many of whom consider tobacco a health culprit.[25]

41.     Indeed, a popular website that sells and provides information on smoke-free tobacco products described ZYN pouches as free of "the standard toxins," making the Products "safer," as depicted in the image below.

## Are ZYN Pouches Safe to Use? (ZYN Safety Guide 2024)

**Yes, ZYN nicotine pouches are safe to use when compared to other nicotine products like cigarettes and snus**. These pouches are completely tobacco-free and do not contain the standard toxins, which makes them much safer.                    [26]

---

[24] Danielle R. Davis et al., *Why Young Adults Use Tobacco-Free Nicotine E-Cigarettes: An Analysis of Qualitative Data*, 150 Addictive Behaviors 107925 (Mar. 2024), https://www.sciencedirect.com/science/article/pii/S0306460323003209.
[25] *See, e.g., Living in ZYN*, Today Explained, Spotify (Jan. 30, 2024), https://open.spotify.com/episode/6KQmgw76FyPzuKmJfyP8Ol?si=udV_hdtnQUeul2ZQl8ZoGw (podcast asserting that ZYN Product causes no health issues apart from nicotine addiction).
[26]*Are ZYN Pouches Safe to Use?*, Snusdaddy, https://snusdaddy.com/inspiration/item/are-zyn-pouches-safe-to-use/ [https://web.archive.org/web/20240625054403/https://snusdaddy.com/inspiration/item/are-zyn-pouches-safe-to-use/].

42.     To illustrate this consumer perception, a study found that a tobacco-free nicotine message among e-cigarette[27] users was associated with lower likelihood of perceiving a product's use as "extremely or very harmful."[28] People reported being "much more or more likely" to use a "tobacco-free" product over non-tobacco-free products.[29]

43.     Another survey found increased intention to use and willingness to pay more for synthetic nicotine products, as opposed to traditional or tobacco-derived nicotine products in e-cigarette users.[30] ZYN's representation of "tobacco-free" induces users to buy and spend more for the nicotine Products because consumers believe the nicotine in the Products is synthetic, when in fact, the Products are not synthetic, but are tobacco-derived.

44.     One study found that claims like "tobacco-free" and images of healthy lifestyles (like the image below from ZYN advertising) evoke perceptions of increased safety.[31]

---

[27] Studies analyzing e-cigarette users are equivalent to nicotine pouch users for this point. Both pouches and e-cigarettes are nicotine delivery devices.

[28] Julia Chen-Sankey et al., *Effect of a 'Tobacco-Free Nicotine' Claim on Intentions and Perceptions of Puff Bar E-cigarette Use Among Non-Tobacco-Using Young Adults*, 32(4) Tobacco Control 501-504 (Oct. 25, 2021), https://pubmed.ncbi.nlm.nih.gov/34697090/.

[29] *Id.*

[30] Kendra Ratnapradipa et al., *Randomised Experiment for the Effect of 'Tobacco-Free Nicotine' Messaging on Current E-cigarette Users' Perceptions, Preferences and Intentions*, 33(4) Tobacco Control 441–448 (June 2024), https://pubmed.ncbi.nlm.nih.gov/36596708/.

[31] Pamela M. Ling et. al., *Tobacco-Derived Nicotine Pouch Brands and Marketing Messages on Internet and Traditional Media: Content Analysis*, 7 JMIR Form Res. e39146 (Feb. 15, 2023), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9978966/.



45.     Perceived health benefits have proven to be a primary reason why people use "tobacco-free" products.[32]

46.     The "tobacco-free" representation on ZYN pouches is material as to a key fact: how healthy ZYN pouches are. Consumers care about their health.[33]

47.     The perception of safety that a "tobacco-free" representation creates in consumers is far from accurate.

48.     First, nicotine, alone, has been found to pose serious health concerns. Nicotine products used during pregnancy have negative effects on the developing brain,[34] and may increase chances of preterm birth and stillbirth.[35] Nicotine increases the risk of cardiovascular, respiratory, and gastrointestinal disorders.[36] Nicotine decreases immune response and adversely impacts

---

[32]  *See, e.g.*, Davis et al., *supra* note 25.

[33]  *Consumers See Health and Well-being as "Essential" Spend Category, Accenture Survey Finds*, Accenture (Sept. 7, 2022), https://newsroom.accenture.com/news/2022/consumers-see-health-and-well-being-as-essential-spend-category-accenture-survey-finds.

[34]  Mallock et al., *supra* note 17.

[35]  Bendik C. Brinchmann et al., *Use of Swedish Smokeless Tobacco During Pregnancy: A Systematic Review of Pregnancy and Early Life Health Risk*, 118 Wiley 5, 789-803 (Dec. 16, 2022), https://onlinelibrary.wiley.com/doi/10.1111/add.16114.

[36]  Aseem Mishra et al., *Harmful Effects of Nicotine*, 36 Indian J. of Med. and Paediatric Oncology 24-31 (Jan.-Mar. 2015), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4363846/.

reproductive health.[37] It affects cell proliferation, oxidative stress, apoptosis, and DNA mutation by various mechanisms, which can lead to cancer.[38] It also affects tumor proliferation and metastasis and causes resistance to chemotherapy and radio therapeutic agents.[39]

49.    Second, the few studies that have emerged raise serious concerns about, specifically, the Products themselves. As explained above, a recent study found that ZYN pouches contained ammonia, chromium, formaldehyde, and nickel, which are harmful compounds found in tobacco.[40] Other researchers are concerned about periodontal diseases, the impact on the gut microbiome and immune diseases, and negative impacts from the toxins present in the flavorings.[41]

50.    Defendants are silent on these issues. The ZYN website and Products' packaging make no mention of whether the Products have been tested or are free from harmful toxins and carcinogens. On information and belief, Defendants do not test the Products for toxins or carcinogens, and based on research to date, batches of the Products likely contain harmful toxins and carcinogens.

51.    Though Defendants warn that the Products contain nicotine, which is "an addictive chemical" (without disclosing the associated health risks of nicotine), this warning is generic, vague, and generates little concern in consumers.[42]

52.    In summary, Defendants' use of the term "tobacco-free" in the Products' advertising is false (insofar as the nicotine is not synthetic and is extracted from tobacco leaves)

---

[37] *Id.*
[38] *Id.*
[39] *Id.*
[40] Back et al., *supra* note 20.
[41] Dongxia Ye & Irfan Rahman, *Emerging Oral Nicotine Products and Periodontal Diseases*, 2023 Int. J. Dentistry 9457475 (Feb. 10, 2023), https://www.hindawi.com/journals/ijd/2023/9437475/.
[42] One could be addicted to green tea, for instance, which would arguably be a healthy addiction, or at least healthier than other options.

and misleads consumers to believe that the health concerns of tobacco are absent from the Products and/or that the pouches are safer than they actually are.

**II.     Defendants' "3mg" and "6mg" Nicotine Labeling Is Ambiguous and Misleads Consumers Regarding the Nicotine Strength and Addictive Potential of the Products.**

53.     Defendants' advertisements and packaging for ZYN nicotine pouches display large "3mg" and "6mg" representations, referring to nicotine levels.



54.     These labels are ambiguous, as they contain no further explanation.  Standing alone, 3mg and 6mg descriptions are difficult to understand. Consumers are confused as to what these numbers mean because the numbers do not clearly convey the expected strength or effect of the nicotine. Defendants intentionally use this confusion to increase sales.

---

[43] *Zyn Nicotine Pouches,* Buy Pods Now, https://buypodsnow.com/product/zyn/ (last visited Sept. 17, 2025).

55.    According to two studies, adult,[44] adolescent, and young adult[45] consumers have difficulty understanding nicotine concentrations presented as mg/ml. The study found that mg/ml nicotine does not accurately convey nicotine strength to users.[46] For instance, consumers cannot discern whether 3mg delivers a strong or a weak dose of nicotine. For new users especially, the strength of the nicotine delivery is difficult to gauge from experiencing the Products alone. Users were more likely to underestimate than to overestimate nicotine strength based on perceiving the labels.[47]

56.    These studies have raised concerns about inadvertent exposure to high nicotine levels.[48]

57.    The studies advocated for "simplified nicotine concentration labeling" to "improve public knowledge."[49]

58.    This confusion is exacerbated when nicotine strength is compared to other nicotine delivery products, especially for consumers transitioning from products like traditional cigarettes where nicotine content is often expressed and delivered differently.

59.    For example, a cigarette, on average, contains 8-20mg of nicotine, but only a small percentage of the nicotine, 10% on average or 1mg to 2mg, is absorbed into the bloodstream.[50]

---

[44] Meghan E. Morean et. al., *Adults Who Use E-cigarettes Have Difficulty Understanding Nicotine Concentrations Presented as mg/ml and Percent Nicotine*, 120 Addictive Behaviors 106965 (Sept. 2021), https://www.sciencedirect.com/science/article/abs/pii/S0306460321001507.

[45] Meghan E. Morean et al., *Adolescents and Young Adults Have Difficulty Understanding Nicotine Concentration Labels on Vaping Products Presented as mg/mL and Percent Nicotine*, Nicotine Tobacco Res. 1389–1397 (Aug. 4, 2021), https://pubmed.ncbi.nlm.nih.gov/33433626/.

[46] Morean *supra* note 44.

[47] Morean, *supra* note 44, 45.

[48] *Id.*

[49] Morean, *supra* note 44.

[50] Sarah Marsh, *How Much Nicotine is in a Cigarette Compared to a Vape?*, The Guardian (June 23, 2023), https://www.theguardian.com/society/2023/jun/23/how-much-nicotine-is-in-a-cigarette-compared-to-a-vape.

CLASS ACTION COMPLAINT

60.     Nicotine pouches, on the other hand, are chemically engineered to have a much higher absorption rate.[51] Therefore, the "actual delivery of nicotine is significantly higher in nicotine pouches than traditional cigarettes."[52]

61.     Another example illustrating the confusion over nicotine delivery between products comes from a study that compared nicotine absorption between ZYN pouches and Swedish General snus, a powdered tobacco that is placed under the lip.[53] The study found that higher levels of nicotine were identified in the bloodstream of the subjects using ZYN 6mg than those using the 8mg General snus.[54] In other words, despite the fact that the General snus contained 2mg more nicotine, subjects absorbed more nicotine using ZYN pouches. The study also found that ZYN 8mg delivered similar amounts of nicotine as other Products listed as 18mg.[55] In other words, ZYN 8mg is delivering similar amounts of nicotine as Products that supposedly contain twice as much.

62.     ZYN pouches representing 3mg or 6mg nicotine mislead people into thinking only a small amount of nicotine is absorbed compared to a traditional cigarette or other products that contain higher amounts of nicotine based on the label, which is incorrect.

---

[51]     Luke Whelan, *Are Nicotine Pouches Bad for You?*, Right as Rain (May 1, 2024), https://rightasrain.uwmedicine.org/well/health/nicotine-pouches-health-risks. *See also, What Strength of ZYN is Right for You?*, ZYN, https://uk.zyn.com/blog/our-products/what-strength-of-zyn-is-right-for-you/ (last visited Sept. 17, 2025) (ZYN United Kingdom site explains that ZYN nicotine pouches **actually deliver** the amount of nicotine shown on the label, in contrast to most other nicotine delivery devices which deliver only a fraction of the nicotine content. Though this is a U.K. site, ZYN pouches are only manufactured in Sweden and Kentucky and the Sweden factory supplies both Europe and the U.S., so it is likely that there are no differences between the U.K. pouches and the U.S. pouches. This would mean that one 3mg ZYN nicotine pouch delivers the nicotine of two cigarettes, and a single 6mg pouch is the equivalent of four cigarettes).

[52]     *Whelan, supra* note 51.

[53]     Erik Lunell et al., *Pharmacokinetic Comparison of a Novel Non-tobacco-Based Nicotine Pouch (ZYN) With Conventional, Tobacco-Based Swedish Snus and American Moist Snuff*, 22 Nicotine & Tobacco Research 1757 (2020), https://doi.org/10.1093/ntr/ntaa068.

[54]     *Id.*

[55]     *Id.*

18
CLASS ACTION COMPLAINT

63.    The result of this confusion is that it becomes very easy to become dependent on large doses of nicotine with ZYN pouches.[56]

64.    Although ZYN packaging states that the Products contain nicotine, which is "addictive," 3mg/6mg nicotine labels are confusing and deceptive because, standing alone, the labels do not clarify the strength of nicotine delivered, especially as compared with other nicotine products. This omission misleads consumes to believe that the strength of nicotine in the Products is less than what it is and/or that the Products are less addictive than they are.

65.    That nicotine pouches in general unwittingly deliver massive doses of nicotine compared to traditional forms of nicotine products is of growing concern:

> With these pouches, you're getting such a high dose and building an extreme tolerance to those high doses. Not only are you getting a massive or large dose of nicotine and triggering huge dopamine releases, but there are no barriers to prevent you from continuously consuming nicotine packets to keep up the rush. "Somebody who is using a pack a day of cigarettes is going to have to find a lot of time in the day to do that activity," says [certified tobacco treatment specialist at the Fred Hutchinson Cancer Center, Brandon] Omernik. "I see people use these pouches all parts of the day because they're super discreet."[57]

66.    Labeling ZYN pouches as containing 3mg/6mg nicotine without additional context does nothing to indicate to consumers the strength of the nicotine being delivered by the Products. How much nicotine is being absorbed is material for consumers because nicotine is an addictive chemical with known harmful effects.

67.    The effects of misleading nicotine labeling are apparent when viewing social media postings discussing ZYN pouches. "Zynfluencers," a term referring to people who officially[58] and

---

[56] Whelan, *supra* note 51.

[57] *Id.*

[58] John Semley, *Meet the Zynfluencers: how nicotine pouches ignited a new culture war*, The Guardian (Feb. 12, 2024), https://www.theguardian.com/business/2024/feb/12/meet-the-zynfluencers-how-nicotine-pouches-ignited-a-new-culture-war.

CLASS ACTION COMPLAINT

unofficially promote ZYN nicotine pouches on social media platforms, have created a notable presence, with videos and posts about ZYN pouches garnering millions of views and interactions. Zynfluencers are usually young adults with a young adult following.[59]

68.     In the post shown below, one commenter, in a stream addressing the perception that 3mg pouches are weak, states that the benefit of 3mg pouches is the "versatil[ity]," allowing for "like 4" pouches in the mouth at once. Four 3mg ZYN pouches in the mouth is likely equivalent, in terms of nicotine delivery, to smoking eight cigarettes simultaneously.



---

[59]     *See, e.g.,* Zynbabwe Utopia (@zynbabweclub), Instagram, https://www.instagram.com/zynbabweclub/?hl=en (last visited Sept. 17, 2025) (the Instagram homepage of a predominant Zynfluencer).
[60]     Zynbabwe Utopia (@zynbabweclub), Instagram, (Mar. 13, 2024), https://www.instagram.com/p/C4deKfeL4F3/?hl=en.

69. That comment is not isolated. Posters speak of using two 6mg pouches at one time, all day long—the likely equivalent, in terms of nicotine delivery, of chain-smoking eight cigarettes simultaneously throughout the day.[61]

70. Social media posts show consumers using ZYN Products in the gym and even while sleeping. In the post depicted below, one user talks about throwing in a ZYN at the first alarm snooze—and another cautions first to spit out the "overnighters."



71. Use-trends on social media, like the examples above, show consumers, presumably believing in the perceived weakness and versatility of ZYN pouches, becoming addicted to the steady flow of high amounts of nicotine delivered into the bloodstream.

---

61      *See, e.g.*, Zynfluencers (@zyn_fluencers), Instagram, (Dec. 9, 2020), https://www.instagram.com/p/CIlFOsJjujt/?hl=en.
62      Zynbabwe Utopia (@zynbabweclub), Instagram, (Feb. 25, 2024), https://www.instagram.com/p/C3xtUpZrDc6/?hl=en.

72.     Defendants' display of "3mg" and "6mg" nicotine labels on the Products is confusing and misleads consumers to believe the addictive nature and nicotine strength of the Products are low and/or at least significantly less than other forms of nicotine-delivery products like cigarettes, which is false.

### III.    Defendants' Advertising Targeting Young People Is Misleading Because the Sale of the Products to Consumers Younger Than 21 Years Is Unlawful.

73.     Defendants' marketing targets minors and young adults, despite the illegality of selling these Products to consumers younger than 21 years of age. The advertising, therefore, is misleading about a material fact—that minors and young adults cannot legally purchase the Products, and that their use of the Products is explicitly against the policy of New York, every other state, and the federal government. This conduct deceives not only young consumers, but also adults who underestimate the risks associated with a product allowed to be marketed to young people.

74.     As of November 13, 2019, New York Public Health Law, Article 13-F, Section 1399-c, prohibits the sale of "tobacco products, herbal cigarettes, liquid nicotine, shisha or electronic cigarettes" to individuals younger than 21 years of age.[63] On December 20, 2019, Congress passed a similar law called "Tobacco 21," outlawing the sale of tobacco and non-tobacco nicotine products to people younger than age 21 in all states.[64]

75.     ZYN marketing and advertisements, notwithstanding the unambiguous legislative mandate, target young people in various ways.

---

[63]     *Legislation    SECTION    1399-CC,    N.Y.    S.*    (Nov.    15,    2019), https://www.nysenate.gov/legislation/laws/PBH/1399-CC.
[64] *Tobacco 21, supra* note 9.

76. A study analyzing ZYN's marketing found that most ZYN models appear to be young adults,[65] such as in the advertisements below.



[65] Ling, *supra* note 31.
[66] ZYN USA (@zyn_usa), Instagram (Sept. 11, 2023), https://www.instagram.com/p/CxENsZyvLgV/?img_index=1.



77.    Defendants' use of youthful models is intentional. Research shows that young people and adolescents are attracted to advertisements featuring models that appear "young and cool," regardless of whether the models are over the age of twenty-one.[68] Adolescents recognize models in their twenties as their "ideal sel[ves]" and "find marketing with models of this age for age-restricted products, like e-cigarettes, particularly appealing."[69]

78.    Additionally, individuals younger than 21 years of age are more likely to buy ZYN pouches if they perceive the marketing to contain messages about tasty flavors.[70]

---

[67] ZYN USA (@zyn_usa), Instagram (July 4, 2023), https://www.instagram.com/p/CuSHWSbpYkn/.

[68] Michelle Jeong et al., *Youth Attention, Perceptions, and Appeal in Response to e-Cigarette Advertising Features: A Focus Group Study*, 44 Preventive Medicine Reports 102789, at 4 (Aug. 2024), https://doi.org/10.1016/j.pmedr.2024.102789.

[69] *Id.*

[70] Shivani Mathur Gaiha et al., *Use, Marketing, and Appeal of Oral Nicotine Products Among Adolescents, Young Adults, and Adults*, 140 Addictive Behavior 107632 (May 2023), https://pubmed.ncbi.nlm.nih.gov/36731224/.

79.     It is widely accepted that young people are attracted to flavors.[71] The data on this fact is staggering.[72] In 2019, nearly seven out of ten youth who were current tobacco users reported that they used a flavored tobacco product.[73]

80.     Nearly 81% of youth ages 12 to 17 who ever used a tobacco product reported that the first product they used was flavored.[74]

81.     Defendants sell the Products in ten different flavors,[75] depicted in the image below, in order to tempt young buyers.



82.     ZYN's advertising strategy uses suggestive imagery of delicious-looking food and

---

[71] *Flavored Tobacco Use Among Youth and Young Adults*, Truth Initiative (June 28, 2021), https://truthinitiative.org/research-resources/emerging-tobacco-products/flavored-tobacco-use-among-youth-and-young-adults.

[72] *Id.*; *see also Results from the Annual National Youth Tobacco Survey*, U.S. Food and Drug Admin., https://public4.pagefreezer.com/browse/FDA/01-11-2023T15:52/https://www.fda.gov/tobacco-products/youth-and-tobacco/results-annual-national-youth-tobacco-survey (last visited Sept. 17, 2025).

[73] Morean, *supra* note 45.

[74] *Id.*

[75] *ZYN Nicotine Pouches (5 Can)*, KMG Import, https://www.kmg-import.com/product/zyn-nicotine-pouches-5-can/ (last visited Sept. 17, 2025).

drinks alongside their nicotine pouches to appeal to young buyers, as shown in the marketing depicted below.

 

83.     Young people are also more likely to buy ZYN pouches if they believe the Products will help them to feel comfortable in social situations, such as in the advertisement depicted below.[78]

[76] ZYN USA (@zyn_usa), Instagram (Mar. 14, 2023), https://www.instagram.com/p/CpxncSvt4Tj/ (advertising ZYN Citrus).
[77] ZYN USA (@zyn_usa), Instagram (May 14, 2023), https://www.instagram.com/p/CsOlEF_s4Fm/ (advertising ZYN Coffee).
[78] Gaiha, *supra* note 70.



84.    A study found that consumers under the age of 21 were more likely to use nicotine pouches if they believe that they could use them anywhere.[80] Playing into this desire, ZYN advertising focuses on feeling "free," unencumbered, and shows users in nature, as in the advertisement depicted below. The advertisements hint that the Products can be used anywhere because there is no smoke and no smell, and the pouches are discrete, meaning parents or adults are not necessarily aware of the nicotine use.

---

[79] ZYN USA (@zyn_usa), Instagram (July 4, 2023), https://www.instagram.com/p/CuSHWSbpYkn/.
[80] Gaiha, *supra* note 70.





85.    Defendants' advertising is making an impact on young consumers. A joint investigation by the U.S. Food and Drug Administration ("FDA") and the Centers for Disease Control & Prevention expressed concern about the growing popularity of the ZYN Products among youth.[82]

86.    In April, the FDA announced issuance of 119 warning letters to, and the filing of forty-one civil money penalty complaints against, brick-and-mortar retailers that engaged in the sale of various flavors of ZYN nicotine pouches to underage consumers between October 2023 and February 2024.[83]

---

[81]  ZYN USA (@zyn_usa), Instagram (Oct. 9, 2023), https://www.instagram.com/p/CyLj62gMb33/.

[82]  "In 2024, 1.8% of middle and high school students reported current nicotine pouch use" and that of those users, "68.7% used ZYN." *See* Eunice Park-Lee, et al., *Notes from the Field: E-Cigarette and Nicotine Pouch Use Among Middle and High School Students — United States, 2024*, CDC (Sept. 5, 2024), https://www.cdc.gov/mmwr/volumes/73/wr/mm7335a3.htm?utm_medium=email&utm_source=govdelivery.

[83]  *FDA Issues Warning Letters to and Files Civil Money Penalty Complaints Against Retailers for Underage Sales of ZYN Nicotine Pouches*, FDA (Apr. 4, 2024), https://www.fda.gov/tobacco-products/ctp-newsroom/fda-issues-warning-letters-and-files-civil-money-penalty-complaints-against-retailers-underage-sales.

87.     As explained *supra*, Section II, the ZYN following on social media has gone viral with a predominantly young adult following.[84]

88.     Young adults post about being "wired all day," performing better at the gym,[85] and feeling increased mental acuity and focus while using the ZYN Products.[86]

89.     Furthermore, Zyn employs the predatory youth-targeting practice of gamification—or incorporating game-like elements of scoring, competition, and rewards to increase participation—in its marketing.

90.     For instance, Defendants incentivize users to purchase the Products in exchange for Zyn rewards points, which can be redeemed for items such as merchandise, gift cards, and iPads.[87]

91.     Defendants even sponsored a concert in April 2025 where hopeful attendees could access tickets only through the Zyn rewards program.[88] The headliner was Noah Kahan, who is notably popular among young audiences, particularly Gen Z.[89]

---

[84] Zynbabwe Utopia (@zynbabweclub), Instagram, https://www.instagram.com/zynbabweclub/?hl=en (last visited Sept. 17, 2025).

[85] Zynbabwe Utopia (@zynbabweclub), Instagram (Apr. 16, 2024), https://www.instagram.com/p/C51r1iDLcQV/?hl=en.

[86] Zynbabwe Utopia (@zynbabweclub), Instagram (Mar. 5, 2024), https://www.instagram.com/p/C4JgJXZrNo-/?hl=en.

[87] *Zyn rewards program following Big Tobacco's marketing playbook*, Truth Initiative (July 2, 2024), https://truthinitiative.org/research-resources/tobacco-industry-marketing/zyn-rewards-program-follows-big-tobaccos-marketing.

[88] Lauren Boisvert, *Scoring Tickets to Noah Kahan's Denver Show Involved Spending Thousands of Dollars on Zyn*, Am. Songwriter (Mar. 5, 2025), https://americansongwriter.com/scoring-tickets-to-noah-kahans-denver-show-involved-spending-thousands-of-dollars-on-zyn/.

[89] *See, e.g.*, Sarah Pittman, *Noah Kahan: A Gen Z Gero Destigmatizing Mentral Health Steps Into Arenas*, Pollstar (Sept. 11, 2023), https://news.pollstar.com/2023/09/11/noah-kahan-a-gen-z-hero-destigmatizing-mental-health-steps-into-arenas/.

CLASS ACTION COMPLAINT

92.    Zyn users describe Defendants' rewards system with the same excitement and incentive as traditional video games marketed to youth. For instance, one user reported, "I feel like a kid in an arcade who's getting all their tickets, and they're going to earn a prize."[90]

93.    Defendants' marketing to teenagers and young people is intentional and mirrors the successful tactics employed by traditional tobacco companies to prey on young people, who are more susceptible to predatory marketing and more prone to poor decision-making.[91]

94.    Studies show that young people's brains are not fully developed or capable of understanding consequences of actions, which impacts this age group's ability to make good decisions about health and general welfare.[92]

95.    The prefrontal cortex, which is responsible for higher-order cognitive functions such as decision-making, impulse control, and reasoning, continues to develop into the mid-20s.[93] This means that adolescents and young adults do not process information, assess risks, or make decisions in the same way that fully matured adults do.[94] This has been found to make this population especially vulnerable to, for example, electronic cigarette advertisements and substance abuse. The same can be expected now of Defendants' nicotine-pouch advertising.

---

[90] Jasmine Li, *Forget airline miles—Gen Z and millennials are obsessed with nicotine pouch Zyn's lucrative rewards program, which includes $400 Apple watches and $600 Dyson AirWraps*, Fortune (May 11, 2024), https://fortune.com/2024/05/11/zyn-rewards-nicotine-pouch-prizes-millennial-gen-z/.

[91] *National Survey Indicates More Young Adults Begin Tobacco Use With Vaping, Not Cigarettes*, Med. Univ. S. Carolina (Nov. 13, 2023), https://hollingscancercenter.musc.edu/news/archive/2023/11/13/national-survey-indicates-more-young-adults-begin-tobacco-use-with-vaping-not-cigarettes.

[92] Mariam Arain et al., *Maturation of the Adolescent Brain*, 9 Neuropsychiatric Disease & Treatment, 449–61 (Apr. 3, 2013), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3621648/.

[93] *The Teen Brain: 7 Things to Know*, Nat'l Inst. of Mental Health, https://www.nimh.nih.gov/health/publications/the-teen-brain-7-things-to-know (last visited Sept. 17, 2025); *see also* Sunita Bava and Susan F. Tapert, *Adolescent Brain Development and the Risk for Alcohol and Other Drug Problems*, 20 Neuropsychol Rev. 398–413 (Oct.. 19, 2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2988999/.

[94] David M. Lydon, M.S. et al., *Adolescent Brain Maturation and Smoking: What We Know and Where We're Headed*, 45 Neurosci Biobehav Rev. 323–342 (July. 12, 2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4451240/.

96.     Defendants market the Products to young people nationwide, including in New York and Connecticut, implying and suggesting that the Products can lawfully be sold to them, when in fact they cannot.  Defendants, therefore, misrepresent a material fact about the Products—that they cannot be legally sold in the State to people younger than age 21. This conduct deceives not only younger consumers but also adult consumers who perceive no restrictions on the marketing of the product to youth.

97.     Defendants market to youth for the purpose of creating demand among young people for clandestine acquisition and use of the ZYN Products, hooking them on this nicotine before they are old enough even to make rational decisions about the use of a harmful and addictive substance. Defendants also market to youth for the purpose of hiding the fact that the Products cannot lawfully be sold to persons younger than age 21 because of its risks.

## CLASS ALLEGATIONS

98.     Plaintiff Siegert re-alleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

99.     Plaintiff Siegert brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all other similarly situated individuals within the United States (the "Class"), defined as follows: all consumers who purchased the Products within the United States during the applicable statute of limitations period (the "Class Period") and until the date of class certification.

100.     Included in the Class, to the extent necessary, is a subclass of all persons who purchased the Products (as defined herein) in New York during the Class Period (the "New York Subclass").

101.     Excluded from the Class are (1) Defendants, any entity or division in which either Defendant has a controlling interest, and Defendants' legal representatives, officers, directors, assigns, and successors; and (2) the judge to whom this case is assigned and the judge's staff.

102.     There are substantial questions of law and fact common to all members of the Class, which will predominate over any individual issues. These common questions of law and fact include, without limitation:

a)  Whether Defendants are responsible for the marketing at issue;

b)  Whether the marketing of the Products was unfair, misleading, false, deceptive, fraudulent, and/or unlawful;

c)  Whether Defendants' conduct as set forth above injured Plaintiff Siegert and Class members.

103.     Plaintiff Siegert's claims are typical of the claims of the Class. Plaintiff Siegert is a member of a well-defined class of similarly situated persons, and the members of the Class were similarly affected by ZYN's conduct and are owed the same relief, as alleged in this Complaint.

104.     The precise number of the Class members and their identities are unknown to Plaintiff Siegert at this time but may be determined through discovery.

105.     Plaintiff Siegert will fairly and adequately protect the interests of the Class and has no interests that are antagonistic to the claims of the Class. Plaintiff Siegert will vigorously pursue the claims of the Class and Subclass.

106.     Plaintiff Siegert has retained counsel who are competent and experienced in consumer protection litigation, including class actions relating to false advertising. Plaintiff Siegert's counsel have successfully represented plaintiffs in complex class actions and currently represent plaintiffs in similar complex class action lawsuits involving false advertising.

107.    A class action provides a fair and efficient method, if not the only method, for adjudicating this controversy. The substantive claims of Plaintiff Siegert and the Class are nearly identical and will require evidentiary proof of the same kind and application of the same laws. There is no plain, speedy, or adequate remedy other than by maintenance of this class action.

108.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because Class members number in the thousands and individual joinder is impracticable. The expense and burden of individual litigation would make it impracticable or impossible for proposed Class members to prosecute their claims individually, and the disposition of this case as part of a single class action will benefit the parties and reduce the aggregate judicial resources that would be spent if this matter were handled as hundreds or thousands of separate lawsuits. Trial of Plaintiff Siegert's and the Class members' claims together is manageable.

109.    No member of the Class has a substantial interest in individually controlling the prosecution of a separate action.

110.    The prerequisites to maintaining a class action for equitable relief are met. Defendants have marketed the Products as "tobacco-free," which is both false as to the nature of the Products and misleadingly implies that the Products are safer than tobacco-derived nicotine products; Defendants represent that ZYN Products are 3mg/6mg nicotine without providing additional information; Defendants intentionally target young adult buyers when it is illegal for people younger than age 21 to purchase the Products; and Defendants designed the Products and Defendants oversee the manufacturing and distribution of the Products. The Products as designed and distributed by Defendants are still in circulation, the representations are live and continue to

pose a risk of harm to consumers, and Defendants have a continuing responsibility to mitigate or prevent that harm. Defendants continue to benefit from sales by resellers, including ongoing brand advertising and visibility, licensing fees and royalties, residual profits from inventory sales, and continued distribution and sale of the Products. Defendants are therefore responsible for how the Products are marketed, labeled, and represented to consumers and are responsible for ensuring issues with the Products are addressed, including misleading representations and omissions, safety concerns, and regulatory compliance, regardless of when or how the Products are sold. Defendants therefore have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final equitable and monetary relief with respect to the Class as a whole.

111.    The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendants. Additionally, individual actions could be dispositive of the interests of the Class even where certain Class members are not parties to such actions.

112.    Defendants' conduct is generally applicable to the Class as a whole, and Plaintiff Siegert seeks, *inter alia*, equitable remedies with respect to the Class as a whole. As such, ZYN's systematic policies and practices make declaratory relief appropriate with respect to the Class as a whole.

113.    Defendants' improper consumer-oriented conduct is misleading in a material way in that the marketing, *inter alia*, induced Plaintiff Siegert, New York Subclass members, and all Class members to purchase and/or to pay the requested price for the Products, and caused them to continue buying the addictive Products, when they otherwise would not have started using the Products, would not be continuing to use the Products, or would not be paying the requested price.

114.    Defendants made the misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

115.    Plaintiff Siegert, the New York Subclass members, and the Class members have been injured by their purchase of the Products, which they otherwise would not have purchased and would not be continuing to use, which were worth less than what they bargained and/or paid for, which they paid the requested price for, and which they selected over other products that may have been truthfully marketed.

116.    ZYN's advertising induced Plaintiff Siegert, the New York Subclass members, and all the Class members to start using and buying the Products, to buy more of them and continue buying them, and/or to pay the price requested.

117.    As a direct and proximate result of Defendants' violation of law, Plaintiff Siegert, members of the New York Subclass, and all Class members paid for falsely advertised Products and, as such, have suffered damages in an amount to be determined at trial.

118.    Injunctive relief is also appropriate in this case because of the addictive nature of the Products, which may create a perpetual relationship with these nicotine Products, causing consumers to continue to buy them and need truthful information going forward. Even if working hard to discontinue nicotine use, Plaintiff Siegert has a strong interest in having full disclosure regarding the Products. Plaintiff Siegert and other Class members wish to be able to make the best choices among nicotine pouches, in terms of health dangers, accurate description of nicotine, increased tendency for addiction through the use of flavors, and price. Because future harm is likely at the hands of Defendants, injunctive relief is appropriate in this case.

119.    Plaintiff Siegert knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance of a class action.

## CAUSES OF ACTION

### COUNT I
**Violations of the New York General Business Law § 349**
**(On Behalf of Plaintiff Siegert and the New York Subclass)**

120.    Plaintiff Siegert realleges and incorporates herein by reference all preceding paragraphs of this Complaint as though set forth and at length herein.

121.    The acts of Defendants, as described above, and each of them, constitute unlawful, deceptive, and fraudulent business acts and practices.

122.    Defendants market and advertise their Products as "tobacco-free," which is false as to the nature of the Products as tobacco-derived substances, as well as misleads consumers to think that the Products are safer than they are.

123.    ZYN markets the Products as "3mg" and "6mg" nicotine, which misleads customers to think the Products deliver a low amount of nicotine, and are less addictive than they are, and is ambiguous regarding a material component of the Products.

124.    Defendants market their Products to young people, misleading all consumers as to the fact that it is illegal in all states to sell these Products to people younger than age 21.

125.    Defendants made the misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

126.    ZYN has violated § 349 of the New York General Business Law ("NYGBL"), which makes deceptive acts and practices unlawful. As a direct and proximate result of

Defendants' violation of § 349, Plaintiff Siegert and other members of the New York Subclass have suffered damages in an amount to be determined at trial.

127.    By reason of the foregoing, Plaintiff Siegert and the New York Subclass members are entitled to (1) actual damages and/or statutory damages; (2) punitive damages; and (3) reasonable attorneys' fees, pursuant to NYGBL § 349(h).

### COUNT II
**Violations of the New York General Business Law § 350**
**(On Behalf of Plaintiff Siegert and the New York Subclass)**

128.    Plaintiff Siegert realleges and incorporates herein by reference all preceding paragraphs of this Complaint as though set forth and at length herein.

129.    The acts of Defendants, as described above, and each of them, constitute false advertising in that each is misleading in material respects as described *supra* § I, II, and III.

130.    New York General Business Law § 350 provides: "False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

131.    NYGBL § 350-a defines "false advertising," in relevant part, as "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect."

132.    Defendants made the false statements willfully, wantonly, and with reckless disregard for the truth.

133.    Plaintiff Siegert and the New York Subclass members have been injured by their purchase of the Products. As a direct and proximate result of Defendants' violation of § 350, Plaintiff Siegert and other members of the New York Subclass have suffered damages in an amount to be determined at trial.

134.    On December 23, 2024, a pre-suit letter was sent to all the Defendants via certified mail that provided notice of the violations of state consumer protection statutes and demanded that within thirty (30) days from the date of the letter, Defendants correct, repair, replace, or otherwise rectify the unlawful, unfair, false, and/or deceptive practices complained of herein. The letter also stated that if the Defendants refused to do so, a complaint seeking damages would be filed. Defendants each received the letter between December 26 and 30, 2024, but they have failed to take corrective action.

135.    Accordingly, Plaintiff Siegert, on behalf of himself and all other members of the New York Subclass, seeks compensatory damages, punitive damages, and restitution of any ill-gotten gains due to Defendants' acts and practices.

### COUNT III
**Violation of State Consumer Protection Statutes**
**(on Behalf of Plaintiff Siegert and All Class Members)**

136.    Plaintiff Siegert realleges and incorporates herein by reference all preceding paragraphs of this Complaint as though set forth and at length herein.

137.    Defendants' unfair, false, misleading, and fraudulent practices in marketing the Products, as alleged herein, violate each of the following state consumer protection statutes to the extent that Defendants' Products have been marketed in, and purchased by Class members in, the respective states: Ala. Code § 8-19-5(27); Alaska Stat. § 45.50.471(a); Ariz. Rev. Stat. § 44-1522; Ark. Code § 4-88-107(a), (a)(10); Cal. Civ. Code § 1750, Cal. Bus. & Prof. Code §§ 17200, 17500, 17580.5; Colo. Rev. Stat. §§ 6-1-105 (e), (g); Conn. Gen. Stat.§ 42-110b(a); Del. Code Ann. tit. 6, § 2513(a); Fla. Stat. Ann. § 501.204; Ga. Code § 10-1-393(a); Haw. Rev. Stat. § 480-2(a), (d); Idaho Code § 48-603(17); 815 Ill. Comp. Stat. Ann. § 505/2; Ind. Code § 24-5-0.5-3(a); Iowa Code

§ 714H.3(1); Kan. Stat. § 50-626(a); Ky. Rev. Stat. § 367.170; La. Rev. Stat. Ann. § 51:1405(A); Me. Rev. Stat. Ann. tit. 5 § 207; Md. Code Comm. Law § 13-301(1), (3); § 13-303; Mass. Gen. Laws Ch. 93A, § 2(a); Mich. Comp. Laws Ann. § 445.903(1)(s), (bb), (cc); Minn. Stat. § 325F.69(1); Miss. Code § 75-24-5(2)(e),(g); Mo. Rev. Stat. § 407.020(1); Mont. Code § 30-14-103; Neb. Rev. Stat. § 59-1602; Nev. Rev. Stat. § 598.0915(15); N.H. Rev. Stat. § 358-A:2; N.J. Stat. Ann. § 56:8-2; N.M. Stat. Ann. §§ 57-12-2(D), 57-12-3; N.Y. Gen. Bus. Law §§ 349, 350; N.C. Gen. Stat. § 75-1.1(a); N.D. Century Code §§ 51-15-02, 51-15-02.3; Ohio Rev. Code § 1345.02; Okla. Stat. Ann. tit. 15, §§ 753, 752(13); Or. Rev. Stat. § 646.608(1); 73 Pa. Stat. § 201-2(4); R.I. Gen. Laws §§ 6-13.1-1(6)(xii), (xiii), (xiv), 6-13.1-2; S.C. Code § 39-5-20(a); S.D. Codified Laws § 37-24-6(1); Tenn. Code § 47-18-104(a); Tex. Bus. & Com. Code § 17.46(b)(2),(3),(5),(7),(24); Utah Code Ann. § 13-11-4(1); Vt. Stat. Ann. tit. 9, § 2453(a); Va. Code Ann. § 59.1-200(A)(14); Wash. Rev. Code § 19.86.020; W. Va. Code §§ 46A-6-102(7); Wis. Stat. Ann. § 100.18(1); Wyo. Stat. Ann. § 40-12-105(a)(xv).

138.    Defendants made the misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

139.    Plaintiff Siegert and all Class members have been injured by their purchase of the Products.

140.    As a direct and proximate result of Defendants' violation of consumer protection law, Plaintiff Siegert and all other Class members have suffered damages in an amount to be determined at trial.

141.    On December 23, 2024, a pre-suit letter was sent to all Defendants via certified mail that provided notice of Defendants' violations of state consumer protection statutes and

demanded that within thirty (30) days from the date of the letter, Defendants correct, repair, replace, or otherwise rectify the unlawful, unfair, false, and/or deceptive practices complained of herein. The letter also stated that if Defendants refused to do so, a complaint seeking damages would be filed. Defendants each received the letter between December 26 and 30, 2024, but they have failed to take corrective action. Accordingly, Siegert, on behalf of himself and all other members of the Class, seeks compensatory damages, punitive damages, and restitution of any ill-gotten gains due to Defendants' acts and practices, according to the availability of relief under the applicable statutes.

**COUNT IV**
**Breach of Implied Warranty of Merchantability**
**(on Behalf of Plaintiff Siegert and All Class Members)**

142.    Plaintiff Siegert realleges and incorporates herein by reference all preceding paragraphs of this Complaint as though set forth and at length herein.

143.    Plaintiff purchased the Products from resellers inside and outside of this State.

144.    The Products were not altered by Plaintiff or by Class members.

145.    At the time of purchase, Defendants warranted that the Products were "tobacco-free," which implied that the Products would not be tobacco-derived, have the safety risks associated with tobacco or tobacco-derived nicotine products, and/or that the Products are safer than they really are. In actuality, these Products are derived from tobacco and pose significant health concerns based on nicotine content, harmful toxins, and chemicals.

146.    Defendants, therefore, breached the warranty implied at the time of sale in that Plaintiff and the other members of the Class did not receive goods that were as represented, and

the goods were not merchantable as fit for the ordinary purposes for which such goods are used or as promoted, marketed, advertised, packaged, labeled, or sold.

147.    Defendants knew that the Products contained tobacco-derived substances, as well as nicotine, harmful chemicals, compounds, and toxins, Defendants advertised the Products as "tobacco-free" anyway, deceiving Plaintiff and the Class.

148.    Defendants also took no action to remedy the inferiority or to cure the breach.

149.    As a direct and proximate cause of Defendants' breach of the implied warranty, Plaintiff and Class members have been injured and harmed because they would not have purchased the Products if they knew the truth about the Products, namely, that they were unfit for use and posed a significant safety risk.

150.    Among other things, Plaintiff and members of the Class did not receive the benefit of the bargain and have suffered other injuries as detailed above. Moreover, had Plaintiff and the Class members known the true facts, they either would not have purchased the Products, would have purchased fewer Products, or would not have been willing to pay the premium price Defendants charged for the Products.

151.    Plaintiff Siegert, on behalf of himself and the Class, seeks compensatory damages, attorney's fees, costs, and any other just and proper relief available under law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Siegert respectfully requests that the Court enter judgment in his favor and in favor of the Class as follows:

A.       An order certifying the proposed Class and New York Subclass; appointing Plaintiff Siegert as representative of the Class and New York Subclass; and appointing Plaintiff Siegert's undersigned counsel as counsel for the Class and New York Subclass;

B.       A declaration that Defendants are financially responsible for notifying Class members of the pendency of this suit;

C.       An order declaring that Defendants' conduct violates the statutes referenced herein;

D.       An order awarding monetary damages, including actual damages, statutory damages, compensatory, and punitive damages, in the maximum amount provided by law under the common law and the statutes named herein;

E.       Injunctive relief;

F.       An order for prejudgment interest on all amounts awarded;

G.       An order awarding Plaintiff Siegert and the other Class members the reasonable costs and expenses of suit, including their attorneys' fees; and

H.       Any further relief that the Court may deem appropriate.

## JURY TRIAL DEMANDED

Plaintiff Siegert hereby demands a trial by jury.

DATED: September 26, 2025          Respectfully submitted,


                                    *s/ Robert A. Izard*
                                    Robert A. Izard (ct01601)
                                    Craig A. Raabe (ct04116)
                                    Christopher M. Barrett (ct30151)
                                    **IZARD, KINDALL & RAABE, LLP**
                                    29 South Main Street, Suite 305
                                    West Hartford, CT 06107

CLASS ACTION COMPLAINT

T: 860-493-6292
rizard@ikrlaw.com
craabe@ikrlaw.com
cbarrett@ikrlaw.com

_____
Kim E. Richman (to be admitted *Pro Hac Vice*)
**RICHMAN LAW & POLICY**
1 Bridge Street, Suite 83
Irvington, NY 10533
T: 914-693-2018
krichman@richmanlawpolicy.com

*Attorney for Plaintiff Siegert*
*and Proposed Class*